## CLARE, Adm'x, etc., *v.* PROVIDENCE & S. S. Co.

*(Circuit Court, S. D. New York.* June, 1884.)

1. COLLIDING STEAMERS—LAW AS TO NAVIGATING IN A FOG.

   The law requires that every steam-vessel shall, when in a fog, go at moderate speed, and the theory that full speed is the safest speed when offered as an excuse for infringing the law, cannot be accepted by the courts.

2. SAME—WILLFUL BREAKING THE LAW ENTAILS UPON THE LAW-BREAKER FULL CONSEQUENCES OF HIS ACT.

   One who takes a course forbidden by law does so at his peril, and the excuse that the unlawful way is the best way will not save him.

In Admiralty.

*Isaac N. Miller,* for plaintiff.

*Wheeler H. Peckham,* for defendants.

COXE, J. This action is brought by Almira R. Clare, as administratrix of Charles C. Clare, her deceased husband, to recover damages of the defendants for having negligently caused his death. The defendants are common carriers, and on the eleventh of June, 1880, they were the owners of the two steamers, the Narragansett and the Stonington. On the evening of that day the former was proceeding from New York to Stonington, Connecticut, and the latter from Stonington to New York, via Long Island sound. At about 11 : 30 P. M., which was their usual hour for meeting, the two vessels collided, the Narragansett, upon which the plaintiff's intestate was a passenger, took fire and sank, and he was drowned. The sound at this point is about 12 miles wide. The night was still and dark and there was a dense fog. Both vessels were upon the same course, going at about 11 knots (between 12½ and 13 miles) per hour. This was their usual rate of speed. Though it was customary for the Stonington to make her trips with two pilots, on this occasion she had but one. When she first sighted the Narragansett the latter was about 150 feet distant, headed across the Stonington's bow. The Stonington then gave signals in quick succession to slow down, to stop, to back water, and to back strong. It was then too late. There was not time enough to stop. The Stonington was, prior to the collision, engaged in signaling approaching vessels to go to the right by short blasts upon her whistle. She was also blowing fog whistles about three times per minute. She heard the Narragansett's fog whistle when the latter was from three to five minutes off, apparently about a point and a half on her port bow. The wheel of the Stonington was then put hard a-port and her head turned about five points to the right, but her speed was not slackened. The captain of the Narragansett, on the contrary, testified that he made the Stonington a point or a point and a half on his starboard bow, and he gave orders to starboard his helm.

The defendants introduced testimony to prove that experience has demonstrated that in fogs on Long Island sound accidents are less

likely to occur if vessels run at full speed. The sound is navigated by taking a course from light to light. In thick weather it is customary, after leaving one light, to run the time nearly up which is required to make the next light, at the usual rate of speed. The boat is then stopped and feeling her way cautiously by sounding she makes the second light, and this is repeated through the sound.

It is urged that if the rate of speed is changed or the boat stopped, except in the vicinity of a light, the reckoning will be lost, or at least less accurately attained. That if the steamer is slowed down in the strong currents and crossed tides of the sound the danger of drifting or running onto the rocks, reefs, and points, which everywhere abound, is vastly increased. In short, it is maintained by those accustomed to the navigation of the sound that by keeping up the regular speed they are better able to make their courses, handle their boat, and tell their whereabouts than by adopting a different rule.

The defendants introduced the record of the proceedings in the district court in the matter of the Narragansett, taken under the act of March 3, 1851, entitled, "An act to limit the liability of ship-owners and for other purposes," and they insist that the decree there rendered constitutes a bar to this action. The court decided that this position was well taken as to the Narragansett, but that in so far as the plaintiff's right to recover depended upon the negligence of the Stonington, which was not surrendered, the proceedings in the district court were not a bar and that the question whether or not the Stonington was at fault should be submitted to the jury. The jury found for the defendants and the plaintiff now moves for a new trial on several grounds, only one of which will be considered.

It is urged that the verdict should be set aside as contrary to evidence and to law, for the reason that there was a clear and palpable violation of sailing rule No. 21. The rule is as follows:

"Every steam-vessel, when approaching another vessel, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse; and every steam-vessel shall, when in a fog, go at moderate speed." Rev. St. § 4233, p. 818.

No case has been found, where this rule was under consideration, which holds that $12\frac{1}{2}$ or 13 miles an hour is moderate speed for a steam-vessel in a fog. On the contrary, the decisions are unanimously the other way. *The Pennsylvania*, 19 Wall. 125, (7 knots;) *The Colorado*, 91 U. S. 692, (5 or 6 miles;) *The Blackstone*, 1 Low. 485, (8 knots;) *The Rhode Island*, 17 Fed. Rep. 554, (15 miles;) *The State of Alabama*, Id. 847, (8 or $8\frac{1}{2}$ knots;) *The City of New York*, 15 Fed. Rep. 624, (10 knots;) *The Eleanora*, 17 Blatchf. C. C. 88, (between 5 and 6 miles;) *The Leland*, 19 Fed. Rep. 771, (8 miles;) *The Bristol*, 4 Ben. 397, (16 miles;) *The Hansa*, 5 Ben. 502, (7 knots;) *The Manistee*, 7 Biss. 35, (7 miles.)

It is true that the foregoing are causes in the admiralty, and the criticism is made that the question of speed was determined as a ques-

tion of fact. It is urged by the defendants that, because one court concludes upon the evidence before it in a particular case that eight knots per hour, for instance, is immoderate speed, no reason is therefore suggested why another tribunal, in different circumstances, should reach the same conclusion. That to argue to the contrary is tantamount to the absurdity of contending that because a jury determined that 25 miles an hour is too high a rate of speed for a railroad train at a particular crossing, every other jury in similar cases should be constrained to find the same way. This position would quite likely be well founded if the only questions decided were questions of fact, but it will be observed that in several of the cases referred to, some of which were not presented to the court upon the trial or argument, a construction is placed upon rule 21, that in all circumstances "moderate speed" means less than usual speed.

In *The Pennsylvania*, 19 Wall. 125, the court, at page 133, say:

"Our rules of navigation, as well as the British rules, require every steamship, when in a fog, 'to go at moderate speed.' What is such speed may not be precisely definable. It must depend upon the circumstances of each case. That may be moderate and reasonable in some circumstances which would be quite immoderate in others. But the purpose of the requirement being to guard against danger of collisions, very plainly the speed should be reduced as the risk of meeting vessels is increased. * * * And even if it were true that such a rate (7 knots) was necessary for safe steerage, it would not justify driving the steamer through so dense a fog along a route so much frequented, and when the probability of encountering other vessels was so great. It would rather have been her duty to lay to."

In *The Blackstone*, 1 Low. Dec. 485, the court, adopting the language of another case in the same circuit, says, at page 488:

"What would be moderate speed in the open sea, would not be allowable in a crowded thoroughfare or in a narrow channel. And under the same circumstances in other respects, the speed should be the more moderate according as the fog is more dense. The only rule to be extracted from the statute and a comparison of the decided cases is, that the duty of going at a moderate speed in a fog requires a speed sufficiently moderate to enable the steamer, under ordinary circumstances, seasonably, usefully, and effectually to do the three things required of her in the same clause of the statute, viz., to slacken her speed, or, if necessary, to stop and reverse."

In *The Colorado*, 91 U. S. 692, the court, at page 702, use this language:

"Different formulas have been suggested by different judges as criterions for determining whether the speed of a steamer in any given case was or was not greater than was consistent with the duty which the steamer owed to other vessels navigating the same waters; but perhaps no one yet suggested is more useful, or better suited to enable the inquirer to reach a correct conclusion, than the one adopted by the privy counsel. *The Batavier*, 40 Eng. Law & Eq. 25. In that case the court say, 'At whatever rate she [the steamer] was going, if going at such a rate as made it dangerous to any craft which she ought to have seen, and might have seen, she had no right to go at that rate.'"

In *The Rhode Island*, 17 Fed. Rep. 554, the court says, page 557:

"The rate of speed at which the Rhode Island was going in a dense fog, viz., 15 miles per hour, is far beyond that 'moderate speed' which the rules of navigation permit. This has been so often discussed, and the prior adjudications are so numerous and uniform, that it cannot be deemed longer an open question."

In *The State of Alabama*, Id. 847, the court says, page 852:

"The failure to slacken speed in this fog must be set down as one fault in the steamer. Although the fog was not dense, it was nevertheless evidently such a fog as materially to interfere with the timely observation of other vessels, and therefore increased materially the dangers of navigation. To go at full speed in such a fog is not a compliance with rule 21, which requires steamers in a fog to go at moderate speed. * * * No steamer's speed is moderate in the sense of rule 21 so long as she is going at her ordinary full speed. She is required to moderate and reduce her speed according to the density of the fog and the increased difficulty of discovering danger, and of adopting timely means to avoid it. * * * Without determining whether 8 or 8½ knots would or would not be a moderate rate for vessels of much higher ordinary speed in so light a fog as prevailed on the night of this collision, I must hold it not moderate for this steamer, because not moderated or reduced from her ordinary speed."

In *The City of New York*, 15 Fed. Rep. 624, the court, having under consideration rule 21, says, at page 627:

"This rule plainly imposes upon a steamer two duties: (1) To proceed in a fog at a *moderate speed;* (2) in approaching another vessel so as to involve danger of collision, to *slacken* her speed, and, if necessary, to stop and back. * * * Whatever 'moderate speed' may be, under given circumstances, * * * it is, at least, something materially less than that full speed which is customary and allowable when there are no obstructions in the way of safe navigation. To continue at full speed, therefore, as the steamer in this case substantially did, or until the bark was in sight, was a clear violation of the statutory obligation to go at moderate speed.'

In *The Eleanora*, 17 Blatchf. C. C. 88, the court, at page 100, says:

"A simple slackening of speed by a steamer in a fog is not always enough. She must run at a moderate speed, and is never justified in coming in collision with another vessel, if it be possible to avoid it. This implies such a speed only as is consistent with the utmost caution. * * * Her rate of speed must be graduated according to the circumstances. The more dense the fog the greater the necessity for moderation."

In *The Leland*, 19 Fed. Rep. 771, the court, at page 773, says:

"It is an undoubted violation of the sailing rules for a steamer to run at a reckless or dangerous rate of speed in a fog. What is a moderate, and what is a dangerous, rate of speed, are, of course, to some extent, comparative terms, depending upon surrounding circumstances. * * * This rate of speed, (8 miles per hour,) I have no doubt, was too great in a dense fog, in the night-time, upon waters where the liability to collision was so imminent as on the waters of Lake Michigan, even at this early season of the year."

In *The Manistee*, 7 Biss. 35, the court says:

"I know what steam-boat men say, that they must make their time; that they must run in a fog. But they cannot be permitted to run with their usual speed in a fog, surrounded by sail-vessels, against which they are liable to collide at any moment."

The conclusion derived from these authorities is: That "moderate speed" means moderated speed; reduced speed; less than usual speed. It was not the intention of congress that steam-vessels should run as fast in a fog as in fair weather. Applying the rule so construed to the Stonington, there is no possible escape from the conviction that she was guilty of a grave maritime fault. The law said to her that she must not run at the rate of 11 knots an hour in a fog, and, yet, in total disregard of the statute, she was running at 11 knots an hour, at midnight, in a dense fog, and at a time when she knew that she was in close proximity to the colliding vessel. She was going so fast that all efforts to avoid or mitigate the collision were unavailing. It can hardly be contended that this high rate of speed did not produce or contribute to the accident. Had the steamer been going at a less rate not only would she in all probability have heard the signals sooner, but she could have stopped in less space, and, though the collision might have occurred, the blow would have been less severe. Within the cases cited, it must be said upon this evidence that the Stonington was at fault, and that the finding of the jury exculpating her was not in accordance with the evidence and the law.

It is thought that the sailing rule referred to, which has its counterpart in the English admiralty, contains provisions the wisdom of which can hardly be disputed. If in the opinion of others it states an erroneous principle of navigation, it behooves those interested to petition congress for its repeal, or modification so far as it relates to Long Island sound. While it remains the law it is incumbent upon the courts to see that it is properly enforced. Those who violate it do so at their peril. If the owners of vessels navigating the sound choose to take a course forbidden by law, they should clearly understand that when loss and injury happen they must take the consequences, and that the excuse that the unlawful way is the best way, will not be accepted by the courts.

A new trial is ordered.